Barnes, Judge, dissenting.
[18] I respectfully dissent. I am not opposed to reversing a CHINS adjudication when the evidence to support it is entirely lacking. See J.M. & T.K. v. Indiana Dep't of Child Servs. , 83 N.E.3d 1256 (Ind. Ct. App. 2017) (authoring opinion reversing CHINS adjudication), trans. denied ; J.M. v. Indiana Dep't of Child Servs. , 72 N.E.3d 519 (Ind. Ct. App. 2017) (concurring in opinion reversing CHINS adjudication). I also would admit that the evidence here was not the strongest. But, I believe it was sufficient to meet DCS's burden of proving by a preponderance of the evidence that E.Y. is a CHINS.
[19] The first element of the CHINS case that DCS had to prove here, aside from E.Y.'s age, was whether E.Y.'s physical or mental condition was seriously impaired or endangered by Mother's inability, refusal, or neglect to supply E.Y. with necessary food, clothing, shelter, medical care, education, or supervision. See Gr.J. & J.J. v. Indiana Dep't of Child Servs. , 68 N.E.3d 574, 580 (Ind. 2017) (quoting Ind. Code § 31-34-1-1 ). It is true that there is a lack of direct evidence that E.Y. was suffering emotionally or physically at the time of the CHINS hearing or at any time. However, "the CHINS statute does not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered." K.B. v. Indiana Dep't of Child Servs. , 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015).
[20] There was evidence here that when police and DCS first encountered Mother, she was unemployed and hearing voices of her former employer coming from a TV set. She and E.Y. were being forced out of the hotel where they were currently living; even if Mother had another place to stay, this along with her lack of employment is indicative of an unstable lifestyle that could seriously endanger E.Y. E.Y. was taken by DCS to the hospital at that time for treatment of his asthma, which was not being properly treated while in Mother's care. An untreated serious medical condition like asthma poses a great risk to a child.
[21] The majority correctly notes that evidence regarding Mother and E.Y.'s situation at the time of the CHINS hearing itself, three months after the petition was filed, is lacking. I agree that usually we are supposed to consider the evidence at the time of hearing, not just the filing of the petition. This lack of evidence, however, can be chalked up to Mother's refusal to cooperate and communicate with DCS. DCS caseworker Tianna Ceaser, who took *1149 over the case at the end of March or approximately six weeks before the CHINS hearing, testified that she attempted to call Mother five or six times, that she only was able to speak with Mother possibly twice, and one of those times Mother told her she had the wrong number and hung up. Mother also was referred to a home-based therapist, who at the time of the CHINS hearing was preparing to discharge Mother from the program because of her complete noncompliance with it; the therapist was never able to schedule an appointment with Mother despite nine attempts to do so over a one-month period. Under the circumstances, I believe it is proper to focus primarily on the available evidence from the time of the filing of the CHINS petition, and not "reward" stonewalling by lack of action.
[22] I reach a similar conclusion regarding Mother's mental health. The fact that she never was diagnosed by a medical professional as suffering from a mental illness does not mean that we should ignore the observations by the police detective, who was told by Mother that she was hearing strange voices coming from the TV, and the visitation coordinator's suspicion that Mother had mental health problems after observing her interaction and lack of interaction with E.Y. Given their observations, it was entirely reasonable for DCS to request that Mother undergo a psychological evaluation. She refused to voluntarily do so. I believe the majority places DCS in the impossible situation of having good reason to suspect Mother has a mental illness but lacking the means to prove that she has one because there is no CHINS finding and it cannot force Mother to undergo a psychological evaluation and, therefore, it cannot prove E.Y. is a CHINS.[6] I believe it prudent to err on the side of caution and not to allow a potentially dangerous situation to fester.
[23] Mother's refusal to cooperate with DCS in this and other matters is evidence that the coercive intervention of a court is necessary to ensure E.Y.'s care and well-being, which is another element of a CHINS proceeding. See Gr.J. & J.J. , 68 N.E.3d at 580. This lack of cooperation also distinguishes this case from the J.M. & T.K. case, in which the parents fully cooperated with DCS after the filing of the CHINS petition. See J.M. & T.K. , 83 N.E.3d at 1262. I believe we should defer to the trial court's judgment here and affirm its finding that E.Y. is a CHINS.

I also do not believe that the fact that a parent's mental illness alone cannot support a termination of parental rights, as noted by the majority, means such illness cannot be considered in a CHINS proceeding, which has different goals and a lower burden of proof.